# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jeremiah M. Johnson,<br><br>    Plaintiff,<br><br>v.<br><br>Virginia Mandac, M.D., Nacole Lind, Leigha Bailey, R.N., Scott Yozamp, and Joseph Witter, in their individual and official capacities,<br><br>    Defendants. | Case No. 16-cv-0268 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Jeremiah Marquis Johnson, 2144 University Ave, St. Paul, MN 55104, pro se

Thomas S. Madison, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for Virginia Mandac, Leigha Bailey, R.N., Scott Yozamp and Joseph Wittwer

Anthony J. Novak and Mark A. Solheim, Larson King, 30 E 7th Street Suite 200, St. Paul, MN 55101, for Virginia Mandac.

HILDY BOWBEER, United States Magistrate Judge

   This matter is before the Court on Plaintiff Jeremiah Johnson's Motion for

Summary Judgment [Doc. No. 148], Defendant Virginia Mandac's Cross-Motion for

Summary Judgment [Doc. No. 157], and the Cross-Motion for Summary Judgment of

Defendants Leigha Bailey,[1] Joseph Wittwer,[2] and Scott Yozamp (hereafter "DOC Defendants") [Doc. No. 165]. These motions were referred to the undersigned United States Magistrate Judge for the issuance of a Report and Recommendation under 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). For the reasons set forth below, the Court recommends that Johnson's motion be denied and that the Defendants' motions be granted.

## I.    PROCEDURAL BACKGROUND

Jeremiah Johnson is a former prisoner in the Minnesota state correctional system. (Johnson Dep. at 13:6-25, 14:1-12 [Doc. No. 161].) On February 4, 2016, while serving his sentence at the Minnesota Correctional Facility in Rush City, Minnesota ("MCF-Rush City"), Johnson filed the instant action against multiple corrections officers and medical staff seeking damages, injunctive relief, and declaratory relief pursuant to 42 U.S.C. § 1983 [Doc. No. 1]. After the Court denied Johnson's application to proceed *in forma pauperis* following screening of his initial complaint pursuant to 28 U.S.C. § 1915A [Doc. No. 13], Johnson filed an amended complaint asserting Defendants were deliberately indifferent to his serious medical needs and therefore violated his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments.

---

[1] In the time since this lawsuit was initiated, Leigha Bailey's name has changed to Leigha Henry. (Henry Aff. ¶ 1 [Doc. No. 171].) For consistency, the Court will refer to her as Leigha Bailey.

[2] The case caption and various other pleadings and orders have referred to this defendant as Joseph "Witter." His actual name is Joseph "Wittwer" (Wittwer Aff. [Doc. No. 179]), so he will be referred to as such in this Report and Recommendation

2

(Am. Compl. [Doc. No. 15].)  On February 1, 2017, the Court dismissed with prejudice Johnson's claims for injunctive and declaratory relief, his official capacity claims against the Department of Corrections defendants, and all claims against Defendant Nacole Lind. (Order Adopting R&R [Doc. No. 84].)  The only remaining claims are for monetary damages under 42 U.S.C. § 1983 against Bailey, Yozamp, Wittwer, and Dr. Mandac in their individual capacities, and apparent state law claims against Bailey and Dr. Mandac for medical malpractice.  *See* (Am. Compl. ¶¶ 1-13; Affidavit for Expert Review [Doc. No. 55]; Pl.'s Mem. Supp. Summ. J. at 7 [Doc. No. 149].)

## II.    FACTUAL BACKGROUND[3]

### A.    Johnson's Evaluation and Treatment for Hypertension and Migraine Headaches

In 2006, Johnson was convicted in Minnesota state court and began serving his sentence at MCF-Rush City.  (Smith Aff., Ex. A at 1 [Doc. No. 178-1]; Johnson Dep. at 12:13-21 [Doc. No. 161].)  Shortly after beginning his sentence, Johnson experienced medical difficulties and was diagnosed with hypertension and migraine headaches.[4]

---

[3]  The Court has carefully reviewed the record and taken into account the evidence supplied by all parties to this action.  However, for ease of reference, the Court primarily cites to the exhibits provided by Defendants.  Johnson and Defendants offer many of the same prison records and medical reports as exhibits in support of their respective motion and cross-motion for summary judgment.  *Compare, e.g.* (Johnson Aff., Ex.'s [Doc. No. 150-4]) *with* (Novak Aff., Ex. B [Doc. No. 162].)  The Court therefore will not cite every source as it recounts the evidence but will note where the parties' evidence diverges as to significant facts.

[4]  Johnson has also been diagnosed with rheumatoid arthritis (Novak Aff., Ex. B at 8-9), as well as a personality disorder and chemical dependency (Johnson Dep. at 28:25-30:9; Pl. Answers to Interrog. at 11-12 [Doc. No. 120].)

3

(Johnson Dep. at 22:12-23:15, 26:11-27:14.)  Medical professionals at MCF-Rush City prescribed Johnson medications to treat both conditions, and Johnson had regular appointments to monitor and adjust his prescriptions.  (Novak Aff., Ex. B at 1-42 [Doc. No. 162].)

The first note in the medical records of contact with any of the defendants appears on January 30, 2009, when Defendant Virginia Mandac, M.D., a physician employed by Centurion Managed Care and contracted to provide medical services at DOC facilities, saw Johnson.  During that visit, Dr. Mandac and added 2.5 mg Lisinopril once daily to his existing medications to further target his high blood pressure, which had not yet responded favorably to treatment.  (Mandac Answer ¶ 5 [Doc. No. 38]; Novak Aff., Ex. B at 40.)  On April 30, 2009, Johnson's hypertension had improved but was not yet in ideal range, and Dr. Mandac increased his Lisinopril dosage to 10 mg once daily.  (Novak Aff., Ex. B at 39)  She increased it again to 15 mg once daily on July 2, 2009.  (*Id.*)  A week later, Dr. Mandac observed that Johnson's blood pressure had increased from the previous visit, so she added 25 mg atenolol daily to his mix of prescriptions.  (*Id.*)  Over the course of the next year, Johnson continued to visit Dr. Mandac on a semi-monthly basis to adjust his medications in an effort to find the correct balance to manage his hypertension.  (*Id.* at 39-35.)

On August 27, 2010, Johnson visited with Carole Ness, M.D. regarding his hypertension and headaches and complained that his headaches had been getting worse.  (*Id.* at 35.)  During that visit, Dr. Ness observed that Johnson's blood pressure was high and also learned that Johnson had been non-compliant with his prescriptions.  (*Id.*)

4

Dr. Ness spoke with Johnson about the importance of taking his medications and informed him about the health risks associated with untreated hypertension.  (*Id.*) Dr. Ness also remarked that the headaches were likely an effect of his elevated blood pressure.  (*Id.*)  One month later, Johnson had a follow-up appointment with Dr. Mandac, at which point she reported that his hypertension was fairly well controlled.  (*Id.* at 34.) She noted that Johnson had missed about six doses of his medication but would continue with his current medication given the favorable blood pressure measurements at the appointment.  (*Id.*)  In the months that followed, however, Johnson quit taking his medications regularly and his blood pressure increased significantly.  (*Id.*)  During his next health appointment, on December 12, 2010, Dr. Mandac informed Johnson that if he did not take his medications, he placed himself at great risk of developing a stroke or heart attack.  (*Id.*)

In the years that followed, Johnson had varying levels of success in managing his hypertension.  (*Id.* at 29-34.)  When Johnson complied with his medications, his blood pressure often read at or near the normal range.  *See, e.g.* (*Id.* at 30.)  When Johnson did not take his medications, his blood pressure was typically significantly elevated.  *See, e.g.* (*Id.* at 29.)

Throughout this time, Johnson continued to suffer regularly from headaches.  (*Id.* at 29-34.)  Dr. Mandac and other medical professionals at the prison attempted to address his headaches with various medications – including Cafergot, Pamelor, Elavil, Tegretol, Topomax, and Depakote – but none proved to be successful.  (*Id.* at 18-34.)  On September 18, 2013, a physician's assistant, Jenefer Southwick, discussed different

options with Johnson to address his headaches, and Johnson agreed to try a new drug, Dilantin. (*Id.* at 17.) In November, December, and February, Ms. Southwick ordered lab tests to monitor the levels of the medication in Johnson's blood, each of which reported that Johnson's Dilantin levels were abnormally low. (*Id.* at 60-62.) Johnson reported to Southwick on February 5, 2014, however, that the Dilantin had been effective at reducing his pain. (*Id.* at 14.) On April 14, 2014, Dr. Mandac increased his dosage of Dilantin to 200 mg twice daily. (*Id.* at 12.) Despite the increased dosage, lab tests ordered by Dr. Mandac on May 5, 2014, again showed that Johnson's Dilantin levels remained abnormally low. (*Id.* at 59.) On June 2, 2014, Dr. Mandac increased his dosage of Dilantin to 400 mg twice daily. (*Id.* at 11.) For the first time on June 24, 2014, lab tests measured blood levels of Dilantin that were within the therapeutic range. (*Id.* at 58.) The next day, however, Dr. Mandac increased his Dilantin prescription again, to 500 mg in the morning and 400 mg at night, noting that Johnson was continuing to report pain, and that his May 5 blood test results indicated he had not yet built up to a therapeutic level of the medication in his body.[5] (*Id.* at 10.) Dr. Mandac ordered that Johnson's serum levels be checked in three weeks and scheduled a follow-up appointment a month later. (*Id.*)

Dr. Mandac saw Johnson just a week later, however, on July 3, in response to several medical concerns, including that he was continuing to experience migraines twice a week and that the Dilantin did not seem to be working to control them. (*Id.* at 9.).

---

[5] This note suggests Dr. Mandac had not yet seen the June 24 lab results.

She decided to try him on Topamax again, to be taken in the morning.[6]  The records are unclear, however, as to whether she concomitantly reduced Johnson's Dilantin prescription to 500 mg once each evening.  The August 26 treatment note states that his dosage was 200 mg of Topamax in the morning and 500 mg of Dilantin in the evening.  (*Id.* at 7.)  Nothing in Mandac's treatment notes indicates that this was not the mix of medications for his headaches that was in effect a week later, at the time of the events that led to this lawsuit.  However, the records for his subsequent hospitalization, discussed below, report that at the time of admission on September 3, he was on 500 mg of Dilantin in the morning and 400 mg in the evening, in addition to 200 mg daily of topiramate (the generic name for Topamax).  (*Id.* at 44, 50.)

**B.    Johnson's Evaluation and Treatment for Chest Pain**

On May 19, 2018, Johnson complained of chest pain, specifically in the area of his sternum, and reported that he had been "working out" prior to the pain and had heard a "popping noise."  (Henry Aff., Ex. A at 9 [Doc. No. 172].)  He was given ice and ibuprofen and was seen both the following day and on May 28 by nurses from Health Services to whom he repeated the same information about the location and onset of the symptoms.  (*Id.*)  On June 5, 2014, Johnson was again seen by a Health Services nurse in response to a complaint of pain on the left side of his chest and right shoulder.  (*Id.* at 8.)  The nurse's note again makes reference to Johnson having pulled muscles while

---

[6]  Johnson had previously taken Topamax for his headaches with some success but the medication had been discontinued in July 2012 as a consequence of his being found "cheeking" the medication.  (Novak Aff., Ex. B at 9.)

exercising, and also reported that the pain increased when he laughed.  He was given an electrocardiogram (ECG), which showed no change since an earlier ECG.  The nurse consulted with Dr. Mandac, who agreed the pain was musculoskeletal and prescribed a higher, time-release dose of ibuprofen.  (*Id.* at 8.)

Johnson continued to complain of chest pain on June 23, when he signed up for sick call and saw Defendant Leigha Bailey, a nurse employed by the Department of Corrections at the Rush City facility.  He reported that it seemed worse when he "reache[d] to grab something."  (*Id.* at 7.)  Bailey noted that he had no shortness of breath and no nausea, his lungs sounded normal, and his blood pressure was 120/82.  (*Id.*)  She did, however, sign him up to see the doctor.  (*Id.*)  Dr. Mandac saw him in person two days later, on June 25, and he reported to her as well that he had pulled a muscle while working out approximately six weeks earlier.  He complained of pain across the lower chest area, especially with movement, but denied any shortness of breath.  On examination his blood pressure was 118/88, his heart rhythm was normal, but he had some tenderness in the area of the sternum and said that it hurt when he took a deep breath.  Dr. Mandac diagnosed him as having musculoskeletal chest pain and recommended a pain medication and an over-the-counter muscle rub.  (Novak Aff., Ex. B at 10.)

## C.    Johnson's July 2014 Placement on Segregation Status and Subsequent Medical Care

On July 19, 2014, Johnson got into an argument with a prison medical staff member who was visiting him to respond to complaints of constipation.  (Henry Aff.,

8

Ex. A at 7.)  Johnson was upset about his living conditions and that he had not yet

received medication for his constipation.  (*Id.*)  In protest, Johnson ingested 19 Plaquenil

pills he had in his cell.  (*Id.*)  Bailey responded to the scene and called poison control, and

Johnson was sent to the hospital to have his stomach pumped.  (*Id.* at 6-7.)  As a result of

this incident, Johnson was placed on segregation status for 90 days.  An inmate on

segregation status is housed in his own cell, to which he is typically confined for 23 hours

a day, and is subject to enhanced monitoring with significant restrictions placed on his

access to personal property.  (Smith Aff. ¶ 4 [Doc. No. 178].)

    While on segregation status, Johnson continued to be seen by prison medical staff

and by Dr. Mandac for his health concerns.  *Inter alia,* he continued to complain to

Health Services personnel about pain in the area of his chest.  (Henry Aff., Ex. A. at 6.)

On July 21, 2014, Johnson reported pain on the left side of his chest and along his ribs,

but he reported no shortness of breath.  (*Id.*)  He also reported that he had quit taking his

blood pressure medications and signed a refusal form.[7]  (*Id.*)  Another ECG was

performed, but no changes were observed relative to his previous ECG.  (*Id.*)

    Johnson again complained of chest pain on July 22, 2014, and was seen by Bailey,

who reported that he pointed to his upper left abdomen as the site of the pain.  (*Id.*)

Bailey found that his blood pressure was high but saw no signs of distress, and explained

---

[7]  Johnson alleges that he believed his blood pressure medications were causing him to
suffer painful gastrointestinal side-effects.  *See, e.g.* (Am. Compl. ¶ 22.)  In the July 21
nursing note, however, he is reported as having said that because he was wearing a
"suicide gown" in the aftermath of the Plaquenil overdose, it was "too cold to drink water
to take his meds."  (Henry Aff., Ex. A. at 6.)

to Johnson that the failure to take his blood pressure medication could cause complications. (*Id.*) He was seen again the same day by another nurse after renewed complaints of chest pain. Again, he denied any shortness of breath, and he told the nurse he had been working out just prior to the onset of the chest pain. The nursing note remarks that he had previously been encouraged to avoid strenuous exercise until his chest pain resolved, but that he had refused to follow that recommendation. (*Id.* at 5-6.) Dr. Mandac saw him the same day, and although he complained of chest pain, the area he described was not in his chest, and she reported that he was experiencing no shortness of breath, that his lungs were clear and his heart rhythm normal. Johnson also reported having pain between his shoulder blades on July 23, 2014, which was assessed by another nurse as mostly likely the result of a recent incident in which Johnson was handcuffed after an outburst. (*Id.* at 5.)

On August 1, 2014, Johnson complained of stomach pains, decreased appetite, and significant back pain to a nurse at the facility, and she scheduled a doctor's appointment for him. (*Id.* at 3, 5.) Dr. Mandac saw him again on August 13, 2014, for complaints of abdominal cramping, and noted that his blood pressure was once again elevated. (Novak Aff., Ex. B at 8.) Johnson informed Dr. Mandac that he refused to take his blood pressure medications, and Dr. Mandac once again warned him about the potential consequences of that decision. (*Id.*)

On August 21, 2014, Johnson was seen by Bailey in response to a report that he had thrown up with blood in his vomit, had passed blood in his stool, and was feeling lightheaded and nauseated. (Henry Aff., Ex. A at 3.) The next day, in response to

Johnson's claim of chest pain, prison officials activated an Incident Command System ("ICS")—the protocol the prison uses to respond to an emergency.  When medical personnel arrived in response to the ICS, however, Johnson reported he was not in distress and that he was not having chest pains at the time.  (*Id.* at 3.)  Bailey assessed him in connection with the ICS and noted that Johnson's blood pressure was high but that his lungs sounded clear.  (*Id.*)  Bailey instructed Johnson to take his blood pressure medications, and Johnson agreed to resume taking them.  (*Id.*)

On August 26, 2014, Dr. Mandac saw Johnson, and again reported in her treatment notes that his hypertension was uncontrolled because he was not taking his medications.  Her notes also indicate Johnson complained of stomach pain and headaches, and that he had not been eating regularly because of his stomach issues, but that he denied any chest pain or shortness of breath.  (Novak Aff., Ex. B at 7.)

On August 31, prison officials found pills hidden in Johnson's cell, and Johnson made statements threatening to hurt himself and hurt others.  As a result, he was placed on a heightened observation and confinement status.  (Johnson Dep. at 46:16-51:16, 109:24-110:21; Madison Aff., Ex. B at 38 [Doc. No. 168-2].)  On September 1, 2014, Johnson was placed on hunger strike protocol because he had refused to eat.  He again refused his blood pressure medications and was placed on the medical provider's list for follow-up.  (Henry Aff., Ex. A. at 3, 5.)

### D.    September 2014 Medical Emergency

On September 2, Defendant Officer Joseph Wittwer, a DOC corrections officer at MCF-Rush City, woke Johnson up to bring him breakfast, at which time Johnson

informed him that he had vomited in his cell. (Wittwer Aff. ¶ 1 [Doc. No. 179]; Johnson

Dep. at 56:21-57:5, 60:1-24.) Johnson asserts that his vomit contained some blood and

claims that Officer Wittwer observed it. (Johnson Dep. at 56:21-57:5.)[8] Johnson then

asked Wittwer for medical assistance and stated that he was experiencing a medical

emergency. (*Id.* at 57:15-19, 60:23-24.) Wittwer instructed Johnson to press the sick call

button in his cell. (*Id.*) For five minutes, Johnson continued to plead with Wittwer for

more immediate medical assistance, explaining that he was in severe pain from his upset

stomach and vomiting. Wittwer concluded that Johnson was not experiencing a medical

emergency, so he proceeded to finish serving breakfast to the rest of the unit. (*Id*; Am.

Compl. ¶ 16.)[9] The nurse on duty at the time had five other inmates to see that morning

and was unable to immediately respond to Johnson's sick call. (Johnson Dep. at 62:7-8.)

At around 10:25 a.m., Wittwer returned to Johnson's cell to serve him lunch, and

Johnson informed him that he had vomited a second time. (*Id.* at 64:9-25.) Johnson

declined his lunch and inquired as to the status of his sick call visit. (*Id.* at 66:1-7.)

Wittwer replied that the nurse did not have time to speak with him at the moment and he

would have to wait. (Madison Aff., Ex. B at 3.) Johnson then requested that Wittwer

---

[8] Wittwer's declaration neither confirms not denies this observation.

[9] Johnson verified his Amended Complaint under oath. Therefore, insofar as it contains statements of fact to which Johnson would be competent to testify, the Court has considered it as it would a declaration for purposes of assessing the factual record in this case.

activate the ICS because he had thrown up and his chest,[10] stomach, and head were

hurting.  (Johnson Dep. at 67:19-24.)  Wittwer told Johnson that was not a sufficient basis

to activate the ICS, and that he would not do so.  (Madison Aff., Ex. B at 3.)  Johnson

began banging his head on his cell door and crying for medical assistance.  (*Id*; Johnson

Dep. at 70:17-71:12.)  Wittwer then activated the ICS for a self-injurious offender.

(Madison Aff., Ex. B at 3.)  Lieutenant Scott Yozamp, a DOC corrections officer and

program director at MCF-Rush City, responded to the ICS and immediately contacted

Health Services.  (Madison Aff., Ex. B at 3; Yozamp Aff. ¶ 1 [Doc. No. 180].)  Health

Services personnel, including Bailey, arrived on the scene along with a team of

corrections officers.  (Madison Aff., Ex. B at 3.)  Bailey examined Johnson to assess his

condition.  (*Id.* at 6.)  Corrections officers then secured Johnson back in his cell and

Yozamp issued a stand-down order.  (*Id.* at 4.)  Mental health professional Tom Soles

stayed behind to speak with Johnson after the incident but appears to have left shortly

thereafter.  (*Id.* at 3.)

　　　Forty-five minutes later, after he was left alone in his cell, Johnson again began

banging his head on his cell door.  (*Id.* at 8.)  Officer Nathan O'Brien came to his cell and

ordered another ICS for self-injurious behavior.  (*Id.*)  Yozamp arrived on the scene with

a team of prison staff and directed that Johnson be placed on a restraint board to control

---

[10]  Neither Johnson's Amended Complaint nor any of the medical records or reports of
the events on September 2 refer to a complaint of chest pain that day (*see, e.g.,* Am.
Compl. ¶¶ 14-17); however, Johnson stated in his deposition that he included chest pain
among the symptoms he described to Officer Wittwer that morning.  (Johnson Dep. at
67:19-24.)

his self-injurious behavior.  (*Id.* at 10.)  Bailey assessed Johnson before he was placed on

the board and assessed him several times while he was strapped to the board to ensure

that he was not restrained too tightly.  (*Id.* at 11.)  Bailey noted that at all times she was

able to fit two fingers between the restraints, and that Johnson's circulation, motion, and

sensation remained intact.  (*Id.*)  She also noted she was able to take Johnson's pulse in

all four extremities.  (*Id.*)  After about an hour, at 12:20 p.m., Johnson calmed down and

was released from the restraint board.  (*Id.*)  Bailey assessed him again at that time.

(Henry Aff., Ex. A at 4.)  She noted the presence of white phlegm, and that his blood

pressure was 162/120, but she concluded he was not suffering a medical emergency.

(Johnson Dep. at 89:1-90:4, 103:2-22; Henry Aff. ¶¶ 10, 12 [Doc. No. 171].)  Johnson

then asked to see Health Services "for abdominal issues" but was not allowed to.  (*Id.*)

Instead, a medical appointment was scheduled for Johnson for later in the week.  (Henry

Aff., Ex. A at 4.)

At 6:37 a.m. the next morning, Officer Eric Haskamp found Johnson in his cell

unresponsive and having difficulty breathing.  (*Id.* at 14.)  Haskamp immediately

activated an ICS.  (*Id.*)  Sargent Bart Mollet and a number of corrections officers arrived

at Johnson's cell shortly thereafter and attempted to get Johnson to respond or move.

(*Id.*)  After the attempts were unsuccessful, Nurse Heather Emerson requested an

ambulance for Johnson and he was taken to Fairview Hospital in Wyoming, Minnesota.

(*Id.* at 15.)  There, Richard Gordon, P.A., diagnosed Johnson with gastritis and, more

seriously, pulmonary emboli in both lungs.  (Novak Aff, Ex. B at 43-45.)  Gordon was

unable to determine with certainty if the pulmonary emboli were provoked by elevated

14

risk factors for blood clotting or were unprovoked.  He suspected that the emboli could have been provoked by Johnson's "recent immobility with 24-hour segregation [and] confinement with no exercise time."  (*Id.* at 45.)  A follow up ultrasound on Johnson's legs, however, revealed no evidence of deep vein thrombosis, a common precursor to pulmonary embolism, and the discharge summary stated that "no source [was] identified" for the pulmonary embolism.  (*Id.* at 50.)

        In addition to the diagnoses of pulmonary emboli and gastritis, Dr. Amy Anderson found toxic levels of Dilantin in Johnson's blood, measuring greater than 32 micrograms per milliliter (ug/ml).  (*Id.*)  The following day, Johnson's Dilantin levels remained very high, measured at 29.8 ug/ml, which was roughly fifty percent greater than the upper limit of the therapeutic range for the drug.  (*Id.*)  She noted, however, that on his "last stay [at the hospital] 6 weeks ago [he] had a normal Dilantin level," that his "admission medications were appropriate," and that she did not know why he was "Dilantin toxic." (*Id.*)  Dr. Anderson discontinued Johnson's Dilantin medication.  (*Id.* at 47.)  She discharged Johnson from Fairview Hospital at around midday on September 5, 2014, and he returned to MCF-Rush City.  (*Id.* at 48.)

        Nothing in the records from Fairview Hospital states when Johnson first developed the pulmonary emboli, or attributes any particular injury suffered by Johnson to any particular cause, including his segregation, the use of the restraint board, a delay in bringing him to the hospital, or the levels of Dilantin in his blood.  Indeed, there is no evidence in the record indicating that Dilantin in any concentration can cause or contribute to pulmonary emboli.

15

## III.    DISCUSSION

Johnson brings claims in this case under 42 U.S.C. § 1983 against the DOC

Defendants, all of whom are members of the prison staff at MCF-Rush City, asserting

that they acted with deliberate indifference to his serious medical needs and subjected

him to cruel and unusual punishment in violation of the Eighth and Fourteenth

Amendments.  (Am. Compl. ¶1.)  In particular, Johnson asserts that Bailey violated his

constitutional rights by denying him emergency medical assistance on September 2,

2014; Wittwer violated his constitutional rights by failing to secure medical assistance for

him on September 2, 2014; and Yozamp violated his constitutional rights when he

strapped him to a restraint board on September 2, 2014, in the midst of a medical

emergency.  In addition, he claims Dr. Mandac violated his constitutional rights by

failing to follow the appropriate standards of care throughout her treatment of him, and in

particular by subjecting him to toxic levels of the medication in his blood after failing to

properly monitor his Dilantin.  It appears Johnson may also have intended to assert a

medical malpractice claim against at least Dr. Mandac and possibly against Bailey, a

registered nurse.  Finally, he asserts that as a result of Defendants' alleged deliberate

indifference to his serious medical needs, particularly Defendants' delay in providing him

appropriate medical treatment, he suffered excruciating pain and also suffered serious

mental, physical, and emotional harm on top of his existing chronic conditions.

Defendants contend that Johnson has failed to adduce sufficient facts to support a

claim that Dr. Mandac or any of the DOC Defendants acted with deliberate indifference

to his medical needs.  Dr. Mandac argues that the record amply supports that she took

16

appropriate steps to treat Johnson by prescribing medications and monitoring them in an attempt to control Johnson's hypertension and migraine headaches. The DOC Defendants contend that as a matter of law they did not act with deliberate indifference to Johnson, because Johnson's blood clots were not an objectively obvious medical condition. In addition, Bailey and Wittwer argue they could not have been deliberately indifferent to Johnson's medical needs because they were not subjectively aware of his pulmonary emboli. Finally, Yozamp argues that his decision to utilize a restraint board served legitimate penological purposes, and therefore was not a malicious or sadistic act that subjected Johnson to cruel and unusual punishment.

On November 7, 2017, Johnson filed a motion for summary judgment against all Defendants. Shortly thereafter, Defendants filed cross-motions for summary judgment.

**A.    Applicable Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* With respect to an Eighth Amendment claim of deliberate indifference, "the Court applies the same standard as it would in addressing a motion for summary judgment in any other context." *Beck v. Craane*, No. CIV. 06-1075 (JNE/SRN), 2008 WL 5142408, at *2 (D. Minn. Dec. 4, 2008).

In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo*, 92 F.3d 743, 747 (8th Cir. 1996). The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. "Like any other civil litigant," a pro se plaintiff must respond to a defendant's motion for summary judgment "with specific factual support for his claims" sufficient to sustain a jury verdict in his favor. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001).

The Eighth Amendment prohibits the government from inflicting cruel and unusual punishments and "embodies broad and idealistic concepts of dignity . . . against which we must evaluate penal measures." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). "[T]he unnecessary and wanton infliction of pain" is a punishment that offends the Eighth Amendment. *Estelle*, 429 U.S. at 102-03. Unnecessary and wanton infliction of pain occurs where a prison medical professional or corrections officer acts with deliberate indifference to a prisoner's serious medical need. *Id.* at 104. Under those circumstances, a prisoner may obtain recourse against offenders under 42 U.S.C. § 1983 for violating his constitutional right to be free from cruel and unusual punishment. *Id.*

Section 1983 of the Civil Rights Act of 1871, as amended 42 U.S.C. § 1983, provides that any person acting under the color of state law who deprives a person of "rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

18

the party injured in an action at law."  Section 1983 "is not itself a source of substantive rights," *Graham v. Connor*, 490 U.S. 386, 393–94 (U.S. 1989), but rather a "means to vindicate rights conferred by the Constitution or laws of the United States."  *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir.2000).

To state a cognizable claim under § 1983 in a deprivation of medical care case, the inmate must show he had an objectively serious medical need of which the defendants knew but to which they were deliberately indifferent.  *Jones v. Minnesota Dep't of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008).  A prison medical professional or corrections officer acts with deliberate indifference if he or she has actual, subjective knowledge of a prisoner's serious medical need and fails to take reasonable measures to address it. *Jones*, 512 F.3d 478, 482 (8th Cir. 2008).  "It is not enough that a reasonable official should have known of the risk."  *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008). Deliberate indifference is "greater than gross negligence" and requires a showing beyond "mere disagreement with treatment decisions."  *Pietrafeso v. Lawrence County, S.D.,* 452 F.3d 978, 983 (8th Cir.2006).  To discern whether a defendant had actual knowledge of an inmate's serious medical need, the court may infer knowledge "from circumstantial evidence or from the very fact that the risk was obvious."  *Jones*, 512 F.3d at 481–82.

Since in this case, all parties have moved for summary judgment on Plaintiff's claims, the Court must look at whether, when the evidence is viewed in the light most favorable to any party, there is a genuine issue of material fact that could affect the

outcome of the lawsuit.  With regard to the DOC Defendants, that analysis primarily focuses on the events in early September 2014 that led to his hospitalization with pulmonary emboli.  With regard to Dr. Mandac, the inquiry encompasses her treatment of him over the preceding months.  In either case, because "[l]iability for damages for a federal constitutional tort is personal . . . each defendant's conduct must be independently assessed." *Heartland Academy Community Church v. Waddle,* 595 F.3d 798, 805-06 (8th Cir. 2010).

### B.    Section 1983 Claims for Failure to Provide Medical Care

#### 1.   Objectively Serious Medical Need

The DOC Defendants first argue they are entitled to summary judgment on Johnson's § 1983 claims because the evidence fails to show that Johnson suffered from an objectively serious medical need.  In particular, they argue that Johnson had not been diagnosed with a pulmonary embolism in the past and it was not objectively obvious that he required treatment for a pulmonary embolism when prison officials observed him in his cell on September 2, 2014.  The DOC Defendants further note that Johnson had received extensive medical treatment from prison medical staff over the course of the previous months and no risk of pulmonary embolism had been identified.  Therefore, the DOC Defendants argue that as a matter of law, Johnson has failed to satisfy the first prong of his deliberate indifference claim.

Although it was not readily apparent that Johnson was specifically suffering from pulmonary emboli when he called prison staff for help on September 2, 2014, the Court concludes there is sufficient evidence in the record from which a reasonable jury could

find that Johnson suffered from an objectively serious medical need.  "To be objectively serious, a medical need must have been diagnosed by a physician as requiring treatment or must be so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jackson v. Buckman*, 756 F.3d 1060, 1064 (8th Cir. 2014) (internal quotations omitted).  To satisfy the first prong of a deliberate indifference claim under the Eighth Amendment, a plaintiff need not demonstrate that his particular medical condition was objectively apparent.  *Barton v. Taber*, 820 F.3d 958, 964–65 (8th Cir. 2016). Rather, the plaintiff must show that there were obvious signs of an objectively serious medical need, *i.e.* that the plaintiff was seriously hurt or ill and in need of medical attention.  *Id.*  Such an inquiry focuses on the attendant circumstances – the symptoms or evidence of the illness – "irrespective of what the officer believes the cause to be."  *Id.*

Here, the parties do not dispute the basic facts of the events that took place on September 2 and 3 of 2014.  At the beginning of the day on September 2, Johnson informed Wittwer at breakfast time that he had vomited in his cell, and he asked for medical assistance.  Wittwer was also aware that Johnson vomited a second time around lunch time, when Johnson informed him of that fact and once again asked for medical assistance.  In addition, Johnson claims there was blood in the vomit on both occasions and that Wittwer observed it.  Furthermore, Johnson had a history of high blood pressure that was not always well-controlled, and he showed signs of extreme distress in pleading for medical help and banging his head against the bars of his cell.  In addition, he complained to Wittwer at least of severe stomach pain and possibly of chest pain.  While a single episode of vomiting may not rise to the level of an objectively serious medical

need, *see, e.g. Mahamed v. Anderson,* No. CIV.07-4815ADM/FLN, 2009 WL 873534, at
*5 (D. Minn. Mar. 30, 2009), a jury could conclude that more than one incident of
vomiting that involved the regurgitation of blood together with the other reported
symptoms did evidence an objectively serious medical need.  Accordingly, the Court
does not recommend granting the DOC Defendants' motion for summary judgment on
this ground.

On the other hand, for Johnson to prevail on his motion for summary judgment, he
would have to show that the evidence established an objectively serious medical need as
a matter of law, *i.e.*, that no reasonable jury could find otherwise.  The Court is not
persuaded that the evidence is so overwhelming as to justify summary judgment in
Johnson's favor on this prong.  The symptoms he complained of on September 2 had
been raised and addressed in recent medical appointments and there had been no reported
findings indicative of the onset of pulmonary emboli or a comparably emergent
condition.  Furthermore, the record is not clear regarding the extent to which Johnson
reported symptoms beyond his stomach issues (such as chest pain) on the day in question.
On this record, the Court believes a jury could find either for or against Johnson as to
whether he demonstrated an objectively serious medical need on September 2, 2014.
Since there is a genuine issue of material fact as to one of the required elements of
Johnson's claim, Johnson's motion for summary judgment should be denied for this
reason alone.

### 2. Subjective Knowledge and Deliberate Indifference to Serious Medical Need

The DOC Defendants and Dr. Mandac argue that even if the evidence establishes a serious medical need, there is insufficient evidence for a jury to find as to each that they had subjective knowledge of his serious medical need, let alone that they acted with deliberate indifference to it. The second prong of a deliberate indifference claim under the Eighth Amendment requires a showing that the defendant actually knew of an inmate's serious need for medical care and deliberately ignored it. *Barton*, 820 F.3d at 965. "This showing requires a mental state 'akin to criminal recklessness,'" *Jackson*, 756 F.3d at 1065, and the plaintiff must "demonstrate 'more than negligence, more even than gross negligence.'" *Barton*, 820 F.3d at 965 (quoting *Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir.2014)). However, the requisite mental state can be inferred from facts that demonstrate that a medical need was obvious and that the officer's response was "obviously inadequate." *Barton*, 820 F.3d at 965 (quoting *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013). Put another way, if a response to a known risk is obviously inadequate, "this may lead to an inference that the officer 'recognized the inappropriateness of his conduct.'" *Id.* Here, each of the defendants argues that, to the extent they were aware of Johnson's medical condition, they did not deliberately avoid responding to it, and in any event, their conduct was not so grossly deficient as to constitute deliberate indifference.

### a.  Leigha Bailey, R.N.

Johnson asserts that Bailey, a nurse at MCF-Rush City, acted with deliberate indifference to his serious medical needs when she denied him emergency medical assistance on September 2, 2014, allegedly causing him to suffer excruciating pain and additional injuries.  (Am. Compl. at ¶¶ 27-29.)  In his complaint, Johnson points to the occasions that Bailey saw him in the weeks that preceded his medical emergency, particularly for his complaints of chest pain, suggesting that those prior encounters gave her actual knowledge of a serious medical need that should have compelled her to respond differently on September 2, 2014.  However, nothing about those encounters demonstrates that Bailey had subjective knowledge on September 2 that Johnson had a serious medical need that required "emergency medical assistance," let alone that she intentionally refused to provide him with the care that was necessary to address that need. The symptoms of which he was complaining on September 2 were similar to those of which he had been complaining during the prior weeks, and which had been assessed and responded to multiple times not only by Bailey herself but by other nurses and by Dr. Mandac.  No one had identified a condition that required emergency treatment or, indeed, anything more than for Johnson himself to be compliant with his medications and to moderate his exercise to relieve the musculoskeletal pain in his sternum that had been diagnosed based on his own account of how and when it began and where specifically it hurt.

Moreover, nothing in the record establishes when Johnson's pulmonary emboli developed and, in particular, whether Johnson was actually suffering from pulmonary

emboli at any of the times Bailey saw him before he was found unresponsive in his cell (and immediately hospitalized) on September 3. Thus, Johnson does not and cannot identify what "emergency medical assistance" Bailey should have provided at any given time, or how Bailey would have been in a position to provide it. In other words, there is no evidence from which a reasonable jury could find that Bailey deliberately disregarded his medical needs with the knowledge that doing so would expose him to significant risk of harm, or that any failure on her part actually caused him harm. To the contrary, the record indicates that Bailey regularly assessed Johnson's conditions and tended to them in the regular course of her work as a nurse at the Rush City facility, and that she regularly sought additional assistance on his behalf from licensed physicians who treated him but did not see, let alone alert her to, indications of an imminent medical emergency.

Similarly, Johnson has not shown that any delay in Bailey's response caused or exacerbated his injury. The Eighth Circuit has held that "when the inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured 'by reference to the *effect* of delay in treatment.'" *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (quoting *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1188 (11th Cir.1994) (emphasis in *Hill*). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill,* 40 F.3d at 1188 (footnote omitted). *See also Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997).

Therefore, the Court finds that Johnson has not responded to Bailey's motion for summary judgment "with specific factual support for his claims" sufficient to sustain a jury verdict in his favor. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001). Accordingly, the Court recommends granting Bailey's cross-motion for summary judgment and denying Johnson's motion.

### b. Officer Joseph Wittwer

Wittwer is a corrections officer at MCF-Rush City. (Wittwer Aff. ¶1.) Johnson asserts that Wittwer failed to provide him with timely and adequate medical treatment after observing him in distress on September 2, 2014, and therefore acted with deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments. Among other things, Johnson asserts that Wittwer failed to follow DOC Division Directive 301.155 when he observed that Johnson had regurgitated vomit containing some blood but did not activate an ICS. (Am. Compl. ¶¶ 14-15.) Section C, Part 4 of that directive provides that "[w]hen staff or offenders have been injured [in an emergency response effort], medical aid must be rendered as soon as possible. Aid must be rendered by trained professionals or by staff only to the extent of the medical training they have received." (Johnson Ex. A at 48-49 [Doc. No. 15-1].) Johnson also references a number of DOC training policies and asserts that in responding to Johnson's illness, Wittwer failed to follow the policies on which he had been trained. (*Id.* ¶¶ 14-16.)

The Court finds that there is not sufficient evidence to raise a genuine issue of fact as to whether Wittwer acted with deliberate indifference to Johnson's serious medical needs. First, Johnson's conclusory allegations fail to establish that Wittwer's actions

were in breach of DOC Directive 301.155. That Directive governs the provision of medical care to inmates injured during an emergency at the prison. Here, Wittwer was not dealing with a prisoner who had been injured in the course of an emergency response effort, and so his obligation under Directive 301.155 to summon medical aid for such a prisoner was not triggered. Moreover, even assuming for the sake of argument that Wittwer failed to follow an internal policy, it would tend to show only that Wittwer acted negligently, not that he evinced the deliberate indifference required to establish a violation of Johnson's Eighth Amendment rights.

Second, Johnson has failed to establish that Wittwer was aware that his condition required more urgent attention but intentionally disregarded it. Taking the evidence in the light most favorable to Johnson, Wittwer was aware on the morning of September 2 that Johnson was ill, that he had vomited twice and that there was some blood in the vomit, that he was experiencing chest pain and stomach pain, and that he had signed up for sick call but that the nurse had not yet had a chance to see him. (Wittwer Decl. ¶ 6 [Doc. No. 179].). But there is no evidence that Wittwer knew Johnson's symptoms called for an emergency medical response, or that he intentionally avoided taking action knowing that doing so would cause Johnson additional harm. Unlike the circumstances in *Barton,* Johnson's symptoms were not so severe that even a layperson like Wittwer, who was not a medical professional, would recognize he needed urgent attention, nor was his response so obviously inadequate that one could infer that he "recognized the inappropriateness of his conduct." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009).

27

On the contrary, Wittwer did activate the medical emergency ICS when it became apparent that Johnson was attempting to injure himself, and even the trained medical staff who responded did not conclude Johnson's symptoms indicated a need for more urgent medical attention. Thus, it is not clear what more Wittwer could have done under the circumstances to ensure that Johnson received medical attention sooner. But the issue here is not whether, given the information he had, Wittwer could or should have done more; to prevail on an Eighth Amendment medical indifference claim, an inmate must "must allege facts that demonstrate 'more than negligence, more even than gross negligence.'" *Barton*, 820 F.3d at 965. Under these circumstances, Wittwer's conduct does not amount to deliberate indifference.

Finally, as with Bailey, Johnson has presented no evidence that his situation would have been different even if Wittner had responded differently. Under Eighth Circuit precedent, in a case where the crux of the deliberate indifference claim is that the defendant delayed in securing necessary medical treatment, the failure to show the effect of that delay is fatal to the claim. *Crowley*, 109 F.3d at 502; *Dulany*, 132 F.3d at 1243. Accordingly, the Court recommends that Johnson's motion for summary judgment against Wittwer be denied and that Wittwer's cross-motion for summary judgment be granted.

### a. Lieutenant Scott Yozamp

Yozamp is a corrections officer with the DOC assigned to MCF-Rush City. Yozamp Aff. ¶ 1.) Johnson contends that although Yozamp is responsible for ensuring "that all prisoners under his jurisdiction received timely and adequate medical treatment,"

28

he failed to meet that responsibility when he acted with deliberate indifference to Johnson's serious medical need on September 2, 2014. (Am. Compl. ¶¶ 12, 18, 30.) Johnson additionally contends that Yozamp's decision to place him on the restraint board while he was in the midst of experiencing a medical emergency further shows his deliberate indifference to Johnson's serious medical need. (Am. Compl. ¶ A2.)

Yozamp responds that he took appropriate action on September 2, 2014, in responding to Johnson's self-injurious behavior. (Yozamp Aff.) In particular, Yozamp notes that he requested that Health Services assess Johnson after the first incident where Johnson repeatedly hit his head against the cell door, after which Bailey and prison therapist Tom Soles assessed and consulted with Johnson. (*Id.* ¶ 7.) Only after the second incidence of Johnson repeatedly hitting his head against the cell door did Yozamp determine that Johnson's threat to himself required the use of a restraint board to prevent further harm. (*Id.* ¶¶ 8, 27; Madison Ex. B at 10.) Yozamp then oversaw the response team that placed Johnson on the restraint board and, after consulting with Bailey, determined there was no medical reason Johnson should not be placed on the restraint board. (Yozamp Aff. ¶ 14.) Yozamp also oversaw Bailey monitor Johnson's condition during and after being placed on the restraint board. (*Id.* ¶¶ 14-16.) Thus, Yozamp asserts that his decision to use the restraint board, as well as his execution of that decision, comported with prison policy. (*Id.* ¶ 25.)

Based on the foregoing arguments, the Court finds no genuine dispute as to any material fact, and therefore Yozamp is entitled to summary judgment. In fact, there is even less basis in the record to ascribe to Yozamp than to either Bailey or Wittwer a

subjective awareness that Johnson's condition required more urgent medical attention. As Johnson acknowledged, Yozamp "immediately contacted health services following the Minnesota Department of Corrections . . . policy 103.410" (Am. Compl. ¶ 17) and elicited the advice of Health Services personnel before and during his implementation of the restraint board. Therefore, the Court recommends denying Johnson's motion for summary judgment and granting Yozamp's cross-motion for summary judgment on Johnson's claim that Yozamp deliberately disregarded his serious medical need.

### c.  Virginia Mandac, M.D.

Dr. Mandac is a medical doctor employed by Centurion of Minnesota LLC who was assigned to provide medical treatment to inmates at MCF-Rush City during Johnson's period of incarceration. (Mandac Answer ¶5.) Johnson asserts that Dr. Mandac failed to follow the appropriate standards of care when treating him and, in so doing, acted with deliberate indifference to his serious medical needs.[11] (Am. Compl. ¶¶ 19-26.) In particular, Johnson faults Dr. Mandac for not taking x-rays or blood tests to determine the cause of his chest pains and for not monitoring his Dilantin levels after prescribing him with a daily dose of 900 milligrams of the medication. (Am. Compl. ¶ 26.) Johnson implies that these alleged shortcomings caused him to unnecessarily suffer from the pulmonary emboli that hospitalized him on September 3, 2014.

---

[11]  Among other things, Johnson claims that Mandac failed to comply with the Minnesota Health Care Bill of Rights, Minn. Stat. § 144.651 et seq., by engaging in conduct that "demonstrates a willful or careless disregard for the health, welfare, or safety of a patient," Minn. Stat. § 147.091, subd. 1 (g)(3), and "[c]onduct that departs from or fails to conform to the minimal standards of acceptable and prevailing medical practice in which case proof of actual injury need not be established." Minn. Stat. § 147.091, subd. 1 (k).

Dr. Mandac counters that she took appropriate steps to treat Johnson and monitor his progress, and that Johnson is unable to point to any evidence that she acted with deliberate indifference to his medical needs. Dr. Mandac highlights the many dozens of visits she had with Johnson where she made ongoing assessments of his hypertension and migraine conditions, prescribed him with medications to control them, monitored the levels of those medications in Johnson's body, and regularly adjusted his dosages to best target his conditions. By the Court's count, Dr. Mandac visited with Johnson at least 59 times over the five-year span leading up to his hospitalization for pulmonary embolism. *See* (Mandac Ex. A at 1-42.) Dr. Mandac additionally notes the multiple tests she ordered to monitor Johnson's Dilantin levels. (Mandac Ex. A at 57-62.) She also points to the absence of any evidence that Johnson's Dilantin levels were connected to the pulmonary emboli he suffered or otherwise caused him any harm. Moreover, she evaluated and responded to complaints of chest pain in light of his own reports of how it started, what exacerbated it, where on his body he experienced it, and the absence of any additional symptoms such as shortness of breath that might have suggested a need to look for another cause.

After a careful review of the record, the Court finds no genuine dispute as to any material fact and that Dr. Mandac is entitled to summary judgment. At bottom, Johnson asserts that Dr. Mandac acted negligently but "[m]edical malpractice alone . . . is not actionable under the Eighth Amendment." *Popoalii*, 512 F.3d at 499. Neither does "mere disagreement with treatment decisions . . . rise to the level of a constitutional violation." *Id.* "Granted, some medical decisions that a prisoner disagrees with might

31

constitute negligence, but such claims are properly brought only under the applicable tort claims statute and do 'not become a constitutional violation merely because the victim is a prisoner.'" *Cramer v. Iverson*, No. CIV. 07-725(DWF/SRN), 2008 WL 4838715, at *8 (D. Minn. Nov. 5, 2008) (quoting *Estelle*, 429 U.S. at 106, 107). Here, Johnson is not able to point to any evidence that Dr. Mandac knowingly failed to attend to a serious medical need. Quite the opposite, the record shows that Dr. Mandac dedicated considerable attention to Johnson's medical needs and was persistent in her attempts to control his hypertension and migraine headaches—despite the challenge presented by Johnson's failure to comply with the medications which undoubtedly made monitoring his medication levels and his response thereto difficult. Therefore, the Court recommends granting Dr. Mandac's cross-motion for summary judgment on this claim and, correspondingly, denying Johnson's cross-motion.

## C.    Eighth Amendment Claim Regarding Yozamp's Decision to Utilize the Restraint Board

Johnson also claims that Yozamp subjected him to cruel and unusual punishment in violation of his Eighth Amendment rights by stripping off his clothes and securing him to the restraint board while he was in serious medical distress, causing him to suffer injuries beyond those that would otherwise have resulted from his underlying medical issues. (Am. Compl. ¶A2.)[12]

---

[12]  In a single sentence, Johnson additionally alleges that the act of strapping him to the restraint board constituted the tort of assault and battery under Minnesota law. However, this claim fails in the face of qualified immunity. Under the qualified immunity doctrine, "a public official charged by law with duties that call for the exercise of judgment or discretion is not personally liable for damages unless the official is guilty of a willful or

Yozamp responds that his decision to utilize a restraint board was appropriate to prevent Johnson from hurting himself. On the day in question, Johnson twice engaged in self-injurious behavior by repeatedly banging his head against the cell door. After the first head-banging incident, prison officials and medical staff were able to get Johnson to calm down and agree to stop. (Yozamp Decl. ¶ 6 [Doc. No. 180].) After the second head-banging incident, however, Yozamp determined that a restraint board was necessary to prevent Johnson from further injuring himself. (*Id.* ¶¶ 7-8.) Yozamp consequently ordered prison staff to place Johnson on a restraint board in an adjacent cell and made sure that Johnson was not exhibiting any sign of medical distress in the process. (*Id.* ¶ 14-15.) It is undisputed that Johnson was secured to the restraint board for about an hour, and that he was released once he calmed down and agreed to stop hitting his head against the cell door. (*Id.* ¶ 17.) Once Johnson became compliant with the directions of prison staff, Yozamp ordered that he be removed from the restraint board. (*Id.*) On these facts, Yozamp asserts that he acted appropriately in deciding to utilize the restraint board and only used it to the extent necessary to protect Johnson.

The Court finds no genuine dispute as to any material fact regarding Johnson's claim against Yozamp, and concludes that Yozamp is entitled to judgment as a matter of law. "After incarceration, only the unnecessary and wanton infliction of pain constitutes

---

malicious wrong." *Kariniemi v. City of Rockford*, 882 N.W.2d 593, 600 (Minn. 2016). Here, Yozamp decided to strap Johnson to the restraint board to prevent him from injuring himself in the course of his duties as a prison officer. Johnson has not offered facts to demonstrate that Yozamp was "guilty of a willful or malicious wrong" in choosing to do so. Therefore, Johnson has not stated a viable claim for assault and battery under Minnesota law.

cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). "This inquiry turns on 'such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted.'" *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017) (quoting *Whitley*, 475 U.S. at 321.) Here, it is undisputed that Yozamp decided to place Johnson on the restraint board only after he failed to respond to the directives of prison officials, and in so doing, placed himself at risk of injury by repeatedly banging his head against his cell door. Under such circumstances, Yozamp's use of the restraint board to subdue Johnson advanced legitimate penological purposes and constituted a good faith effort to restore discipline and prevent Johnson from sustaining further harm. *See* (Yozamp Decl., Ex. B [Doc. No. 180-2].) ("Staff are permitted to use force and restraints . . . [to] prevent[] an offender from injuring him/herself or others.") Further, Johnson has offered no evidence to show that Yozamp's decision to restrain him was an effort to "maliciously and sadistically" cause him harm. *Hudson*, 503 U.S. at 6-7. Therefore, the Court finds no genuine issue for trial with respect to Johnson's claims against Yozamp relating to the use of the restraint board. It therefore recommends granting his cross-motion for summary judgment on this claim and denying Johnson's motion.

### D.     State Law Claim for Medical Malpractice

The Amended Complaint does not explicitly assert a claim for medical malpractice but does use language that suggests Johnson intended such a claim against Dr. Mandac.  (Am. Compl. ¶¶ 24-26.)  In addition, he filed a document on September 14, 2016 [Doc. No. 55] in an apparent attempt to provide the first of two affidavits that, as discussed below, are required of the plaintiff in any medical malpractice case.  Therefore, because "pro se complaints are to be construed liberally," *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004), the Court will assume Johnson intended to assert a claim for medical malpractice against Dr. Mandac and consider whether either party is entitled to summary judgment on that claim.

Johnson alleges that Dr. Mandac failed to meet the applicable standards of care by not ordering tests earlier to discover the cause of his chest pain when he began complaining of it in December 2012, and also by prescribing dangerous levels of Dilantin.  (Am. Compl. ¶ 26; Novak Aff., Ex. B at 24 [Doc. No. 162].)  Johnson also contends that Mandac failed to comply with the Minnesota Patients' Bill of Rights by mistreating him and by not providing him with notice of his rights pursuant to Minn. Stat. § 144.652, subd. 1.  (Am. Compl. ¶¶ 24-25.)  He alleges that as a result of Dr. Mandac's departure from the degree of skill and care normally possessed and exercised by physicians under the same or similar circumstances, he suffered injury in the form of multiple pulmonary emboli and Dilantin poisoning.

The Court finds that any claim for medical malpractice must fail because Johnson failed to comply with the mandatory requirements of Minnesota's medical malpractice

statute.  Under Minn. Stat. § 145.682, a plaintiff in an action alleging malpractice must

serve two particular affidavits on the defendant.  The first affidavit must state that the

plaintiff's attorney (or the plaintiff, if pro se) has reviewed the facts of the case with a

qualified expert, and that the expert concluded the defendant deviated from the applicable

standard of care and caused injury to the plaintiff.  Minn. Stat. § 145.682, subd. 3, 5.

The second affidavit must identify each expert witness the plaintiff expects to testify at

trial, must provide a summary of the grounds for each opinion, and must be signed by

each such expert.  Minn. Stat. § 145.682, subd. 4.  "Failure to comply with [the first

affidavit requirement] results, upon motion, in mandatory dismissal with prejudice of

each cause of action as to which expert testimony is necessary to establish a prima facie

case."  Minn. Stat. § 145.682, subd. 6(b).  The same result follows for failure to comply

with the second affidavit requirement.  *Id.*, subd. 6(c).  Here, even if the Court could view

Johnson's filing at Doc. No. 55 as sufficient to satisfy the requirement of the first

affidavit, he provided nothing that satisfies the second affidavit requirement.[13]  (Def.'s

Mem. Supp. Summ. J. at 25 [Doc. No. 167].)  The Minnesota state courts have held that

"section 145.682 leaves no room for the district court to exercise discretion."  *Juetten v.

LCA-Vision, Inc.*, 777 N.W.2d 772, 775 (Minn. Ct. App. 2010).  Therefore, the Court

---

[13]  Even if one could view any of the reports associated with Johnson's hospitalization as
"affidavits" that were "signed" by an expert, any argument that they meet the statutory
requirement fails for a number of reasons, including that they do not opine that any
physician failed to meet the standard of care, let alone that any such failure caused
Johnson's emboli or other injuries.

recommends that Johnson's medical malpractice claims against Dr. Mandac be dismissed with prejudice.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that

1. Plaintiff Jeremiah Johnson's Motion for Summary Judgment [Doc. No. 148] be **DENIED**; and

2. Defendant Virginia Mandac's Cross-Motion for Summary Judgment [Doc. No. 157] be **GRANTED**; and

3. The Cross-Motion for Summary Judgment filed by Defendants Leigha Bailey, Scott Yozamp, and Joseph Wittwer [Doc. No. 165] be **GRANTED.**


Dated: August 1, 2018                  _s/ Hildy Bowbeer_____
                                       HILDY BOWBEER
                                       United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.